IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No. 20-cv-03029 (CJN)

ESTATE OF YONADAV HIRSHFELD, by and
through its administrator, Michael Engelberg,
ELISHEVA HIRSHFELD, ZEMACH HIRSHFELD,
SHALOM HIRSHFELD, NECHEMYA HIRSHFELD,
AMIEL HIRSHFELD, ZIMRAT BRACHA
(HIRSHFELD) ZUKERMAN,  HAYA HAMITAL
(HIRSHFELD) HACOHEN-NOVICK, YEDIDYA
HIRSHFELD, HANA (HIRHSFELD) SHANDORFY,
DAVID YINON HIRSHFELD, AVIYA (HIRSHFELD)
FREEDMAN, ELYASHIV SHMUEL HIRSHFELD,
ELYAKIM HIRSHFELD, and SHILOH HIRSHFELD

       Plaintiffs,

  v.

REPUBLIC OF THE SUDAN
       c/o Minisry of Foreign Affairs,
       Khartoum, Sudan

UNITED STATES OF AMERICA,
c/o United States Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States of America
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

ANTONY J. BLINKEN, in his official capacity as
Secretary of State of the United States of America
United States Department of State
2201 C Street, NW
Washington, DC 20520

       Defendants.

## SECOND AMENDED COMPLAINT

Plaintiffs, by counsel, bring this action for damages against the defendant, Republic of the Sudan ("Sudan") and for declaratory relief against defendants, United States of America, Merrick B. Garland, in his capacity as Attorney General of the United States, and Antony J. Blinken, in his capacity as Secretary of State of the United States. Plaintiffs allege as follows:

### INTRODUCTION

1. This is a civil action pursuant to the Terrorism Exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A and supplemental causes of action. The Plaintiffs are United States nationals who seek to hold Defendant, Sudan, liable for wrongful death, severe and continuing personal injuries, and related torts, that resulted from a Terrorist attack in the Mercaz Harav Yeshiva (seminary) (the "Terrorist Attack" or the "Attack") in Jerusalem, Israel.

2. The Attack was carried out by Alaa Abu Dhein, an operative of Hamas – The Islamic Resistance Movement (a/k/a "*Harakat al-Muqawamah al-Islamiyya*") ("Hamas"), acting on behalf of Hamas and defendant Sudan.

3. Sudan and its agents provided substantial material support to Hamas for nearly thirty years including the time leading up to and beyond the date of the Terrorist Attack.

4. The Plaintiffs are the estate, parents, and siblings of Yonadav Hirshfeld, an 18-year-old United States citizen, who was one of eight unarmed students killed in the Terrorist Attack at the Mercaz Harav Yeshiva.

5. This action seeks damages directly and proximately caused by defendant Sudan and its agents and officials to Plaintiffs, by reason of Sudan's provision of material support and resources to Hamas, the terrorist organization that carried out the attack that killed Yonadav Hirshfeld.

6. After the original complaint was filed, the United States and Sudan entered into U.S.-

Sudan Claims Settlement Agreement, Oct. 30, 2020, T.I.A.S. No. 21-209 (entered into force Feb. 9, 2021) (the "CSA") (Exhibit A hereto), which purported to espouse, settle, and/or cancel most, but not all, terrorism cases and claims against Sudan pursuant to the Terrorism Exception to the FSIA. In exchange for the espousal of the terrorism claims, the CSA provided for compensation nearly all victims of Sudan-sponsored terrorism.

7. Also after the original complaint was filed, and pursuant to the CSA, Congress enacted legislation that restored Sudan's sovereign immunity for its well-documented support of terrorism. See Sudan Claims Resolution Act, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (2020), §§ 1701 *et seq*. (the Act"). Exhibit B. Like the CSA, the Act benefitted nearly all victims of Sudan-sponsored terrorism.

8. The ***only*** Sudan terrorism victims who received no compensation or other benefits for the extinguishment of their claims are the Plaintiffs herein and other U.S. national claimants all of whose claims arise out of Sudan-sponsored terrorist attacks carried out by the Hamas terrorist organization (the "Hamas Victims"). [1] All other known victims of Sudan-sponsored terrorism were either compensated under the CSA and the Act, were allowed to continue to pursue their claims, or both.

9. Sudan filed a motion to dismiss Plaintiffs' complaint claiming that the CSA and Act espoused and extinguished Plaintiffs' claims and restored Sudan's foreign sovereign immunity as to these claims. ECF 19.

10. In addition to seeking relief against Sudan under the Terrorism Exception to the FSIA,

---

[1] In addition to the instant case, the following civil actions have been brought against Sudan based upon its support for Hamas: *Steinberg v. Republic of the Sudan*, civ. case no. 20-cv-2296 (D.D.C.); *Weinstock v. Republic of the Sudan*, civ. case no. 20-cv-3021 (D.D.C.); *Mark v. Republic of the Sudan,* civ. case no. 20-cv-3022 (D.D.C.); *Force v. Republic of the Sudan*, civ. case no. 20-cv-3027 (D.D.C.). Certain issues and the constitutional causes of action raised herein were not presented to the district courts in those cases.

Plaintiffs also challenge the constitutionality of both the CSA and the Act on the grounds that, both facially and as applied, they violate the Plaintiffs' right to equal protection of the laws or their right of access to the courts. Plaintiffs also challenge the constitutionality of the Act, as construed by the D.C. Circuit in *Mark v. Republic of the Sudan*, 77 F.4th 892 (D.C. Cir. 2023), because it precludes federal courts from hearing the Hirshfelds' constitutional claims and thus, violates their due process rights.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330(a), 1331, 1346 and 1605A.

12. This Court has personal jurisdiction over defendant Sudan pursuant to 28 U.S.C. § 1330(b).

13. This District is the proper venue pursuant to 28 U.S.C. Section 1391(e) and (f).

14. The relief requested as to the U.S. Government Defendants is authorized pursuant to 28 U.S.C. § 2201 (declaratory relief) and pursuant to 28 U.S.C. § 2202 (injunctive relief). If the requested injunctive relief is deemed by this Court to be an insufficient remedy, an alternative Writ of Mandamus request is authorized pursuant to 28 U.S.C. § 1361. An award of costs and fees is authorized pursuant to 28 U.S.C. § 2412.

## THE PARTIES

15. Plaintiff Elisheva Hirshfeld is the mother of decedent Yonadav Hirshfeld. She was at all relevant times and is still a United States citizen.

16. Plaintiff Zemach Hirshfeld is the father of decedent Yonadav Hirshfeld. He was at all relevant times and still is a United States citizen.

17. Decedent Yonadav Hirshfeld was a United States citizen. At the time of his death, he was an 18-year-old high school and yeshiva student at the Mercaz Harav Yeshiva in Jerusalem.

18. Plaintiffs Zimrat Bracha (Hirshfeld) Zukerman, Haya Hamital (Hirshfeld) Hacohen - Novick, Yedidya Hirshfeld, Hana (Hirshfeld) Shandorfy, David Yinon Hirshfeld, Aviya (Hirshfeld) Freedman, Shalom Hirshfeld, Nechemya Hirshfeld, Amiel Hirshfeld, Elyashiv Shmuel Hirshfeld, Elyakim Hirshfeld, and Shiloh Hirshfeld are brothers and sisters of Yonadav Hirshfeld, and are all United States citizens.

19.  Plaintiff Michael Engelberg is a United States citizen and has been nominated as the administrator of the Estate of Yonadav Hirshfeld. His application for formal appointment as administrator of the Estate was accepted by the NY County Surrogates Court as case number 2015-4430.

20. Defendant Republic of the Sudan is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603.

21. At the time of the Attack and at the time this action was filed, Sudan was designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Sudan provided material support and resources for the commission of acts of extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, authorized and ratified the actions of its officials, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attack and the harm to the plaintiffs herein.

22. Defendant United States is the proper defendant in an action seeking to declare unconstitutional international agreements and statutes of the United States.

23. Defendant Attorney General Merrick Garland heads the United States Department of Justice ("DOJ"), which is the agency of the United States government responsible for enforcing federal laws. Defendant Garland is sued herein solely in his official capacity as the public official with control over the conduct of the DOJ. Garland has ultimate responsibility for supervising all

5

operations and functions of the DOJ, including regarding decisions whether and how to enforce federal laws. Defendant Garland maintains his principal place of business in the District of Columbia.

24. Defendant Antony Blinken is the Secretary of State. Blinken is sued herein solely in his official capacity as the public official with control over the conduct of the Department of State. The Department of State negotiated and entered into the Claims Settlement Agreement, including related agreements and understandings, and is responsible for implementing the Sudan Claims Resolution Act. Defendant Blinken maintains his principal place of business in the District of Columbia.

## GENERAL ALLEGATIONS

### A. Hamas.

25. Hamas – The Islamic Resistance Movement was founded in December 1987.[2]

26. Hamas is a radical terrorist organization that openly declares its goals of creating an Islamic state covering the entire territory of Israel, the West Bank and the Gaza Strip, as well as the destruction of the State of Israel and the murder or expulsion of its Jewish residents. Hamas seeks to achieve these goals by carrying out terrorist attacks against Jewish civilians in Israel, the West Bank and the Gaza Strip. Hamas proudly and openly acknowledges that it uses terrorism to achieve its political goals. Hamas uses terrorism to coerce, intimidate and influence the Israeli government and public and thereby bring about the eventual eradication of the State of Israel, its replacement with an Arab state, and the murder and/or expulsion of the Jewish residents of the State of Israel.

27. Hamas' official charter calls for the annihilation of the State of Israel and the creation

---

[2]    The name "Hamas" is an acronym for the Arabic phrase *Harakat al-Muqawamah al-Islamiyya* which means "The Islamic Resistance Movement."

of an Islamic state in the territory comprising Israel, the West Bank and the Gaza Strip. Since its founding, Hamas has sought to achieve this goal by using terrorist violence to weaken, undermine and demoralize the State of Israel, and Israel's population, institutions, and economy. Hamas' founding charter explicitly provides that the "usurpation of Palestine by the Jews" should be reversed through a "holy war" and the use of violence.

28. At all relevant times, Hamas has carried out terrorist attacks through its military wing, known as the Izz A-Din Al-Qassam Brigades ("Al-Qassam Brigades").

29. Continuously since 1995, and at all times relevant to this litigation, Hamas has been designated by the United States as a Specially Designated Terrorist ("SDT"). Continuously since 1997 and at all times relevant to this litigation, Hamas has been listed by the United States Department of State as a Foreign Terrorist organization ("FTO"). Continuously since 2001, and at all times relevant to this litigation, Hamas has been listed pursuant to Executive Order No. 13224 as a Specially Designated Global Terrorist ("SDGT").

30. Hamas's practice of carrying out terrorist attacks like the Terrorist Attack, and its multiple designations as a terrorist organization, were and are well known to the public at large, including the Defendant Sudan. With knowledge of Hamas's terrorist goals and with the deliberate intent to further those goals, Sudan provided material support to Hamas for use in terrorist attacks including the Terrorist Attack. Sudan's active role in Hamas terrorism is further detailed below.

B. **Sudan Shared Hamas' Goals and Supported its Terrorist Activities**

31. In June 1989, Colonel Omar al-Bashir initiated a military coup in Sudan and established an Islamic government which was deeply hostile to the United States and to Israel.

32. Throughout al-Bashir's more-than-30-year rule, Sudan provided training, material support, safe haven, and other logistical and strategic support for Hamas.

33. On August 12, 1993, the United States Department of State designated Sudan as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

34. Official State Department records explicitly indicate that Sudan's designation as a state sponsor of terrorism was occasioned by its support for international terrorist groups, including the Hamas, Abu Nidal Organization, Palestine Islamic Jihad, and Hizballah.

35. During all periods relevant to this suit, it has been the continuous and official policy of Sudan to use terrorism against the United States and its allies, including Israel, to advance its interests both domestically and abroad. By providing material support and resources to terrorist organizations, Sudan was able to enlist these terrorist proxies to carry out attacks against the United States and Israel, and to advance Sudanese interests around the world.

36. Towards these ends, Sudan has provided massive material support and resources to numerous anti-American and anti-Israel terrorist organizations, including Hamas, which shares Sudan's violently anti-American and anti-Israel ideology and goals.

## C. Sudan Provided Material Support and Resources to Hamas

37. During the period relevant hereto, Sudan provided Hamas with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, including the Terrorist Attack.

38. Such support was provided continuously, routinely and in furtherance and as implementation of a specific policy and practice established and maintained by Sudan, in order to assist Hamas achieve goals shared by Sudan.

39. Sudan provided the material support and resources detailed below pursuant to an agreement reached between Sudan and Hamas in the years prior to the Terrorist Attack. Under

that agreement, Hamas undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, and in return Sudan undertook to provide Hamas with material support and resources to carry out such extrajudicial killings and terrorist attacks.

40. Sudan provided Hamas with the material support and resources detailed herein through officials, employees, and agents of Sudan (hereinafter: "Officials and Agents").

41. The material support and resources that were provided to Hamas by Sudan and its Officials and Agents in the years immediately prior to the Terrorist Attack for the purpose of facilitating acts of extrajudicial killing and terrorism included inter alia: provision of financial support to Hamas; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to Hamas; providing use of training bases and military facilities in which terrorist training was provided to Hamas and its operatives; providing Hamas and its leaders and operatives safe haven and refuge from capture; providing Hamas means of electronic communication; providing Hamas with financial services, including banking and wire transfer services; and providing Hamas means of transportation.

42. Sudan and its Officials and Agents gave substantial aid and assistance to Hamas, and provided the massive material support and resources described above to Hamas, and thereby aided and abetted Hamas, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, including the Terrorist Attack. Sudan and its Officials and Agents did so with actual knowledge that Hamas had killed and injured U.S. citizens in terrorist attacks and that additional U.S. citizens and other persons would be killed and injured as a result of their aiding, abetting, and provision of material support and resources to Hamas.

43. Sudan and its Officials and Agents knowingly and willingly conspired, agreed, and acted in concert with Hamas, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing, including

the Terrorist Attack. Sudan and its Officials and Agents did so with actual knowledge that Hamas had killed and injured U.S. citizens and that additional U.S. citizens and other innocent civilians would be killed and injured as a result of their conspiracy with Hamas.

44. At all relevant times, Sudan's Officials and Agents were officials, employees, and/or agents of Sudan, and performed actions on behalf of Sudan, in furtherance of the interests and policy of Sudan, and within the scope of their office, employment and agency, within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that Sudan's Officials and Agents authorized, planned and caused the provision of funds, terrorist training and other material support and resources by Sudan to Hamas for the commission of acts of extrajudicial killing including the Terrorist Attack.

45. Sudan authorized, ratified, and approved the actions described herein of its Officials and Agents, and is therefore vicariously liable for those actions.

46. Throughout al-Bashir's rule, Sudan provided training, material support, safe haven, and other logistical and strategic support for Hamas. Sudan provided training bases for Hamas, where its operatives studied bomb-making and received military training. Sudan also enabled Hamas and other terrorist organizations to stockpile weapons in its territory and to raise funds, travel, and live in Sudan.

47. Until and through at least 2019, Sudan continued to provide safe haven, local offices, and other forms of support for Hamas.

48. Significantly, at all relevant times hereto, Sudan provided Hamas with a critical weapons-supply route for the transfer of arms from Libya and Iran.

49. Over the entire course of al-Bashir's rule, the Department of State and other U.S. government agencies consistently found that Sudan has provided substantial amounts of material support for Hamas terrorism.

50. Numerous federal court decisions have likewise concluded that Sudan provided critical support for Hamas.

### D. The Terrorist Attack

51.    On the evening of March 6, 2008, Yonadav Hirshfeld, an 18-year-old high school student, was chatting with friends in the courtyard outside the school building at the Mercaz Harav Yeshiva in Jerusalem.

52.    Hamas operative, Alaa Abu Dhein, entered the courtyard and approached Yonadav and his friends. Abu Dhein was carrying a large cardboard box. When he neared the boys, Abu Dhein pulled from the box an AK-47, also known as a Kalashnikov assault rifle, and opened fire on the unarmed students.

53.     After being shot, Yonadav fled into the building and descended a staircase where he collapsed. By the time help reached him, he was dead.

54. Yonadav Hirshfeld, was one of eight students killed in the Attack. Many other students were injured.

55. At an unknown time prior to the Terrorist Attack, Hamas and its military wing, the Al-Qassam Brigades, planned, conspired, and made preparations to carry out a Terrorist Attack at the Mercaz Harav Yeshiva.

56. Sudan and its agents, officials, and terrorist units provided material support to Hamas for the Attack, including, without limitation, planning, training, funding, logistics, and organization.

57. Soon after the attack, the Reuters News Agency reported that an anonymous source claimed responsibility for the attack on behalf of Hamas.

58. In response, a spokesman for Hamas stated that, unless a Hamas official signed a

written statement claiming responsibility, no such responsibility could be ascribed "officially" to Hamas.

59. On December 10, 2010, Hamas published a "celebration" of its 23 years of existence and terrorism, entitled "The Path of Glory." In this publication, Hamas officially and formally listed the March 6, 2008 Mercaz Harav terrorist attack as one for which it claimed and accepted responsibility. It provided many operational details of the Terrorist Attack, and named the attacker as a "martyr" of the Al-Qassam Brigades, Hamas' operational military arm.

60. On June 27, 2018, the Israeli National Police raided the home of Alaa Abu Dhein's family and seized tens of thousands of Israeli Shekels in cash, which, according to intelligence information that led to the raid, was provided to the family by Hamas as partial compensation for the Terrorist Attack that Abu Dhein had carried out ten years earlier.

61. On August 30, 2018, the United States District Court for the District of Columbia entered a judgment in favor of the Plaintiffs against the Islamic Republic of Iran in which it concluded that Hamas carried out the Terrorist Attack. *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107 (D.D.C. 2018).

62. Hamas was enabled to, and did in fact: recruit, indoctrinate, conceal, and train the operative who carried out the Terrorist Attack; purchase the weapon used in the Terrorist Attack; build, maintain and activate the human, material, and operational infrastructure needed and used to plan, organize and execute the Terrorist Attack; and take all the other steps necessary to carry out the Terrorist Attack; as the result of, due to, and by utilizing, the financial support, personnel, organization-building activities and assistance, and other material resources and support that were provided to Hamas by Sudan.

63. On October 20, 2020, Plaintiffs filed this action against Sudan.

12

E.  **The U.S. and Sudan Entered into the Claim Settlement Agreement**.

64. On October 30, 2020, the United States and Sudan signed a Claims Settlement Agreement. U.S.-Sudan Claims Settlement Agreement, Oct. 30, 2020, T.I.A.S. No. 21-209 (entered into force Feb. 9, 2021), Exhibit A.

65. The preamble to the CSA recognizes the 1998 bombings of the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania (the "Embassy Bombings") and the 2000 attack on the U.S.S.  Cole (the "Cole Attack"). CSA at 2. And without assigning responsibility for those attacks to Sudan, the CSA recognizes Sudan's willingness to address claims arising out of those attack. *Id*. at 3. The preamble does not mention any other terrorist attacks that have been attributed to Sudan.

66. Article II of the CSA specifies the following objectives of the government's action: (a) settling claims of the United States and of U.S. nationals, through espousal; (b) providing meaningful compensation to foreign national terrorism victims who were employed, or performed contracts awarded, by the United States; and (c) barring all terrorism lawsuits by U.S and foreign nationals. CSA at 5.

67. Article III requires the United States to confirm that the necessary legislation has been enacted that restores foreign sovereign immunity to Sudan for terrorism cases. CSA at 6. It also requires Sudan to pay to the United States $335 million to be distributed by the U.S. government as provided in the Annex to the CSA. *Id*.

68. The Annex to the CSA specifies certain claimants that are to receive shares in the distribution. CSA at 10-11. But by identifying certain claimants for compensation, the CSA excluded only one small group of victims of Sudan sponsored terrorism.

69. Under the CSA, the ***only*** Sudan terrorism victims who receive no compensation for the extinguishment of their claims are U.S. national claimants (including the Hirshfelds)

whose claims arise out of Sudan-sponsored terrorist attacks carried out by the Hamas terrorist organization -- the "Hamas Victims."

70. The classifications established by the CSA and Act in no way further the CSA's articulated purposes.

71. The CSA provides no standards that determine which claimants receive payment under the CSA and which claimants do not. But the allocation of hundreds of millions of dollars to all but a single class of U.S. claimants does not square with the stated purposes of the CSA or with the Equal Protection Clause of the Constitution.

72. The claimants who were compensated under the CSA include victims who purportedly entered into "*private*" settlement agreements with Sudan, such as:

  a.  U.S. nationals who are parties to certain identified lawsuits against Sudan that arose out of the Embassy Bombings and the Cole Attack;

  b.  U.S. national Plaintiffs in a separate action against Sudan brought by the survivors of an employee of United States Agency for International Development (USAID) who was assassinated in Sudan in 2008; and,

  c.  the *foreign national* plaintiffs in *Mwila v. The Islamic Republic of Iran*, case no. 08-cv-1377.

CSA at 10, Annex ¶ 1.a. and b.

73. In both the district court and the court of appeals in *Mark v. Republic of the Sudan*, Case No. 21-5250 (D.C. Cir.), Sudan and the government argued that the Hamas Victims were not compensated under the CSA and the Act *because*, unlike other claimants, the Hamas Victims had not entered into so-called "private settlement agreements" with Sudan. See e.g., Govt. Br. at 15; *see also*, Sudan Br. at 7, 24-26 (D.C. Cir. Case no. 21-5250).

74. Similarly, in *Steinberg v. Republic of the Sudan*, Sudan and the government also

14

represented to the court that the Hamas Victims were singled out to be denied compensation *because*, unlike other claimants, the Hamas Victims had not entered into so-called "private settlement agreements" with Sudan.

75. In fact, these so-called "private settlement agreements" were procured through negotiations *by the United States government* with Sudan. They were not "private" agreements.

76. Deeming these individual settlements that were negotiated in secret "private settlement agreements" the government sought to conceal its role in the negotiation of those individual settlements.

77. Notably, one of the cases in which claimants who had allegedly entered into "private settlement agreements" with Sudan was *Taitt v. Islamic Republic of Iran*, case no. 20-cv-1557 (D.D.C.). *Taitt* was filed on June 12, 2020, *twenty years after* the attack on the USS Cole, upon which the lawsuit was based, and only months before the CSA was signed.

78. Other cases arising out of Sudan's role in the bombing of the Cole were filed in 2004 (see *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007)) and 2010 (see *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015)).

79. The Taitt plaintiffs were represented by one of the most politically connected law firms in the District of Columbia.

80. The late-filing of *Taitt* and the fact that the plaintiffs were represented by one of the best-connected law firms in the District of Columbia indicate that the *Taitt* plaintiffs were invited to act and to be included in the benefits of any distribution to be made under the impending settlement between the United States and Sudan.

81. The "private settlement agreements" were not the reason certain claimants were compensated under the CSA. Rather, the government arranged for Sudan to enter into

15

individual settlement agreements with certain specified victims as a pretext to favor those victims over other victims of Sudan-sponsored terrorism, including the Hirshfelds and the other Hamas Victims.

82. In a June 11, 2021 press release issued by USAID, the government inadvertently revealed that the so-called "private settlement agreements" were entered into pursuant to other prior **undisclosed** agreements between the United States and Sudan to further negotiations over the restoration of Sudan's sovereign immunity.

83. The USAID press release, titled, "Statement by Administrator Samantha Power, Compensation Delivered to Family of USAID Employee Killed in Line of Duty in Sudan," stated that the private settlement agreements were made in favor of "specific victims of terrorist attacks" **as part of the negotiations** between the United States and Sudan for restoration of Sudan's foreign sovereign immunities.

84. Thus, rather than justifying the disparate treatment of the Hamas Victims, the private settlement agreements with "**specific victims**" were imposed by the U.S. government upon Sudan **as a condition precedent for** the restoration of Sudan's foreign sovereign immunities and the espousal of the terrorism claims against Sudan.

85. The press release previously appeared on the USAID website at: https://www.usaid.gov/news-information/press-releases/jun-11-2021-compensation-delivered-family-usaid-employee-killed-line-duty-sudan. USAID has removed or relocated the press release. However a true copy of the Press Release remains available on the Internet Archive at: https://web.archive.org/web/20210623204135/https://www.usaid.gov/news-information/press-releases/jun-11-2021-compensation-delivered-family-usaid-employee-killed-line-duty-sudan. A true copy of the press release printed from the Internet Archive filed herewith as Exhibit C.

86. In its appellate brief in the *Mark* case, Sudan affirmatively and falsely asserted that the "private settlement agreements" were beyond constitutional scrutiny because "they do not involve state action by any U.S. government entity." Sudan Br. at 25, *Mark v. Sudan*, case no. 21-5250 (D.C. Cir.).

87. In *Steinberg v. Republic of Sudan*, No. 20-CV-2996 (RCL), 2023 WL 2682369 (D.D.C. Mar. 29, 2023), Sudan and the government similarly misled the court by denying the government's active role in reaching the "private settlement agreements." In *Steinberg*, as in *Mark*, Sudan argued that the private settlement agreements were beyond constitutional scrutiny because they did not involve government action. *Id*. at *8 n.13. Accepting these misrepresentations, the *Steinberg* court held, "these private settlement agreements were already in existence at the time of the CSA." The court clearly did not understand that the so-called private settlement agreements were part of the CSA.

88. Contrary to the misrepresentations made by the government and Sudan to the courts in *Mark* and *Steinberg*, rather than providing a justification for the disparate treatment of the Hamas Victims under the CSA and Act, the U.S. government-negotiated "private settlement agreements" are additional manifestations of unreasonable disparate treatment of the Hamas Victims, including the Plaintiffs herein. [3]

89. After the D.C. Circuit's ruling in *Mark*, Sudan's counsel, White & Case dispelled any doubt as to whether counsel knew that the government was actively involved in the so-called "private settlement agreements."  White and Case issued a press release admitting that the law firm negotiated the settlement agreement on behalf of Sudan. *See, White & Case achieves victory in DC Circuit on behalf of Sudan*, July 27, 2023,

---

[3] The USAID press release and the extent of the deception were only discovered by undersigned counsel during the briefing of the Appellate Reply Brief in *Mark*, and therefore, this issue was never addressed by the courts.

17

https://www.whitecase.com/news/press-release/white-case-achieves-victory-dc-circuit-behalf-sudan (Exhibit D).

90. While providing for payment of the claimants pursuant to the government-orchestrated "private settlement agreements," and for the establishment of a commission to hear and pay claims of foreign national claimants whose claims arose out of the Embassy Bombings, the CSA provides the Hirshfelds with neither payment of their claims nor an alternative forum in which they can have their claims heard.

91. Notably, the means by which the U.S. Government settled the claims of the U.S. national claimants was through espousal a process that makes the claims the subject of a formal claim for reparation to be paid by the responsible government. CSA Articles II(1), IV(1), (2)(d).

92. However, the United States did not make the Hirshfelds' claims the subject of a formal claim for reparation.

93. The United States espoused the claims of the Hamas Victims, including the Hirshfelds, in exchange for compensation to **all** of Sudan's **other** terrorism victims – even to those who are not U.S. nationals. Only the Hamas Victims are excluded from compensation under the CSA.

F. **The Sudan Claims Resolution Act**.

94. As contemplated under the CSA, Congress enacted the Sudan Claims Resolution Act as part of the Consolidated Appropriations Act of 2021. Pub. L. No. 116-260 (2020). Exhibit B.

95. Among other things, the Act strips the federal courts of jurisdiction to hear most terrorism related claims against Sudan, restores Sudan's foreign sovereign immunity as to (almost) all claims arising out of Sudan's involvement in international terrorism, and makes

inapplicable to Sudan (almost) any private right of action relating to state sponsors of terrorism. Act § 1704.

96. Like the CSA, the Act distributes benefits and burdens of the settlement in an arbitrary and capricious manner.

97. While stripping the courts of subject matter jurisdiction to hear terrorism cases against Sudan, the Act legislates a rule-swallowing exception that allows the 9/11 multidistrict claims to proceed. Act § 1706. The Act provides that "the terrorism-related claims of victims and family members of the September 11, 2001, terrorist attacks must be preserved and protected." Act § 1702(3).

98. The Act further provides that the terrorism claims against Sudan of the victims and family members of the 9/11 Attacks are not extinguished; they *remain pending* in the multidistrict proceeding in the Southern District of New York (Case No. 03-MCL-1570). Act § 1706.

99. The September 11 claimant carve-out is based upon the following Congressional finding:

> It is the long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for *international terrorism* serve the national security interest of the United States by deterring the sponsorship of terrorism and by advancing interests of *justice, transparency, and accountability*.

Act § 1706(a)(1) (emphasis added).

100. The CSA and the Act provide compensation for all Sudan-sponsored terrorism victims other than the Hamas Victims, and the Act strips jurisdiction to hear any remaining cases other than the 9/11 multi-district litigation. Thus, despite the proclaimed "long-standing policy" to allow civil actions against those who support *international* terrorism and in contravention of the asserted "interests of justice, transparency, and accountability," the CSA and the Act together

19

nullify *only* the Plaintiffs' claims (and those of other Hamas Victims) against Sudan for its undeniable provision of material support to Hamas.

101. The Act also provides for additional "lump sum" payments to 9/11 Victims, spouses, and dependents. Act § 1705.

102. The Act also appropriates an additional $150 million (over and above the $335 million paid by Sudan) for increased payments to Embassy Bombings victims and their family members who, subsequent to the Embassy Bombings, became naturalized American citizens. Act § 1707(a).

103. This appropriation is claimed to be intended to achieve parity between the *naturalized* American citizen claimants and the claimants who were previously U.S. nationals. *Id.*

104. But no appropriation has been made to achieve parity between Plaintiffs and the other victims of Sudan-sponsored terrorism or to otherwise compensate the Hirshfelds for the termination of their claims.

105. Instead, the CSA and Act terminated the Hamas Victims' claims in exchange for the compensation of *all other* alleged victims of Sudan-sponsored terrorism.

106. The Act conditioned restoration of Sudan's foreign sovereign immunity upon a certification from the Secretary of State confirming that Sudan has made, and the U.S. government has received the payments due under the purported "private settlement agreements" that were entered into under the CSA. § 1704(a)(2)(B) and (C); see also § 1707(c)(2)(B).

G. **The D.C. Circuit Construes the Act to Preclude Federal Courts from Hearing Constitutional Challenges to the CSA and the Act, individually and together**.

107. After the district court granted Sudan's motion to dismiss their complaint, the *Mark* plaintiffs appealed to the D.C. Circuit. D.C. Cir. Case no. 21-5250. While the *Mark* plaintiffs did not assert a cause of action to declare the CSA and the Act unconstitutional, they had opposed the

motion to dismiss by arguing that the CSA and the Act were unconstitutional.

108. The D.C. Circuit affirmed the dismissal. *Mark v. Republic of the Sudan*, 77 F.4th 892 (D.C. Cir. 2023).

109. The court held that the Act stripped the court of jurisdiction to even consider the Marks' constitutional challenges to the CSA, to the Act, and to the effect of the two together.

**FIRST COUNT**
**ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)**
**Against Defendant Sudan**

110. The preceding paragraphs are incorporated by reference as though fully set forth herein.

111. Sudan is a foreign state that, since 1993, had continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A and remained so designated until after this lawsuit was filed and after the government and Sudan entered into the CSA.

112. Sudan provided to Hamas material support and resources, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack.

113. Sudan conspired with Hamas to carry out the Terrorist Attack.

114. Sudan's Officials and Agents are officers, employees, and/or agents of Sudan, and they provided the material support and resources that caused and facilitated the Terrorist Attack, and conspired with Hamas to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

115. Hamas is, and was at the time of the Attack, an agent of Sudan, and it carried out the Terrorist Attack while acting within the scope of its agency.

116. The Terrorist Attack was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

21

117. Decedent Yonadav Hirshfeld was murdered in the Terrorist Attack. The murder of Yonadav Hirshfeld caused the plaintiffs -- his mother, father, and siblings -- severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.. In addition, Yonadav Hirshfeld's estate is entitled to survival damages for the pain and suffering he endured after being shot but before he died, and also for loss of income and pecuniary damages for his wrongful death.

118. The murder of Yonadav Hirshfeld and the harm and injuries suffered by the Plaintiffs due to the Terrorist Attack were the direct and proximate result of Sudan's conduct described herein.

119. The conduct of Sudan was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. Section 1605A(c).

120. Sudan is therefore liable for the full amount of plaintiffs' damages and for punitive damages under 28 U.S.C. 1605A(c).

### SECOND COUNT
### ACTION FOR DECLARATORY RELIEF UNDER  28 U.S.C. §§ 2201 AND 2202 AND THE  DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION
### (Equal Protection Claim)
### Against Defendants United States, Garland, and Blinken

121. Plaintiffs reallege and incorporate all previous paragraphs as if fully set forth herein.

122. Plaintiffs seek a declaratory judgment from this Court ruling that the CSA and the Act are unconstitutional and void as they violate the Hirshfelds' rights to equal protection under the Fifth Amendment.

22

123. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken, negotiated and implemented the CSA.

124. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken, conducted the preliminary negotiations with Sudan and others in furtherance of reaching a settlement agreement with Sudan.

125. In conducting the preliminary negotiations with Sudan and others, the Department of State, on behalf of the United States and under the control and direction of Secretary Blinken, reached agreements with Sudan that obligated Sudan to enter into individual settlement agreements with certain specified victims of Sudan-sponsored terrorism.

126. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken conditioned the espousal of terrorism claims against Sudan and the restoration of Sudan's foreign sovereign immunity upon Sudan's entering into these individual settlement agreements with particular victims of Sudan-sponsored terrorism.

127. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken deliberately did not condition any relief for Sudan upon Sudan's entering into individual settlement agreements with the Hirshfelds or the other Hamas Victims.

128. The Department of State, on behalf of the United States and under the control and direction of Secretary Blinken called the individual settlement agreements that it had arranged, "private settlement agreements." However, the individual settlement agreements were the result and product of pressure applied upon Sudan by the United States government.

129. The so-called "private settlement agreements" were the product of state action by the U.S. government.

130. In its preliminary negotiations with Sudan, the Department of State, on behalf of

the United States and under the control and direction of Secretary Blinken treated the Hamas Victims differently than similarly situated victims of Sudan-sponsored terrorism.

131. The CSA and the Act, and the two operating together, treat Hamas Victims of Sudan-sponsored terrorist attacks, including the Plaintiffs, differently than all other victims of Sudan-sponsored terrorist attacks.

132. Because of this disparity, the United States, through the Department of State, agreed to espouse the Hirshfelds' claims without providing them with any compensation or other relief such as an alternative forum within which to pursue their claims. In contrast, the United States, through the Department of State under the control and direction of Secretary Blinken, entered into the CSA which provided compensation to all other victims of Sudan-sponsored terrorism besides the Hamas Victims.

133. The CSA creates classifications that single out one small class of Sudan-sponsored terrorism victims (the Hamas Victims) and treats that class differently than all other victims of Sudan-sponsored terrorism.

134. The Act also treats the Hamas Victims differently than all other victims of Sudan Sponsored Terrorism by, among other things, failing to provide them with compensation in exchange for the espousal of their claims and for the restoration of Sudan's foreign sovereign immunity, and by failing to allow the Hirshfelds and the other Hamas Victims to maintain their actions against Sudan.

135. The constitutionality of the Act cannot be separated from that of the CSA. The Act and the CSA were two parts of a single government action, policy, and course of conduct.

136. The Act and, specifically, its jurisdiction-stripping provision were enacted pursuant to and in performance of the CSA.

137. The jurisdiction-stripping provision of the Act was explicitly contingent upon the performance of the obligations of the CSA.

138. Because the provisions of the CSA and the Act were so interdependent, any constitutional infirmities in the CSA must be attributed to the Act.

139. Contrary to the "interests of justice, transparency, and accountability," the CSA and the Act were negotiated secretly and exclusively in consultation with private lawyers for the favored claimants and for the benefit of those clients alone.

140. As a result, the CSA divides the settlement proceeds among only certain specified victims and the Act expressly provides lump sum payments for others. Act § 1705.

141. The Hamas Victims were forced to bear the burdens of the settlement agreement between the United States and Sudan however unlike all other victims of Sudan-sponsored terrorism, the Hamas Victims received none of the benefits of the settlement.

142. The CSA and the Act, and the operation of the two together also violate the Hirshfelds' rights to equal protection because the disparate treatment of the Hamas Victims significantly interferes with their exercise of their right to seek recourse through the courts while leaving that access intact for other similarly situated terrorism victims whose claims are not impacted by the CSA or the Act.

143. The disparate treatment of the Hamas Victims lacks any legal justification and is in violation of the right of equal protection secured by the Fifth Amendment to the Constitution of the United States.

**THIRD COUNT**
**ACTION FOR DECLARATORY RELIEF UNDER  28 U.S.C. §§ 2201 AND 2202**
**AND THE  DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED**
**STATES CONSTITUTION**
**(Due Process Claim)**

**Against Defendants United States, Garland, and Blinken**

144. Plaintiffs reallege and incorporate all previous paragraphs as if fully set forth herein.

145. The Act, as construed by the D.C. Circuit, strips federal courts of jurisdiction to consider the Hirshfelds' constitutional claims.

146. Any statute that denies a judicial forum for a colorable constitutional claim is unconstitutional and is an infringement of due process.

147. Alternatively, and implicitly in contrast to the D.C. Circuit's construction of the Act, the jurisdiction-stripping provision must be construed to allow the Hirshfelds' constitutional challenges to proceed.

148. The Act is unconstitutional to the extent that it precludes federal courts from considering the Hirshfelds' constitutional challenges to the CSA, to the Act, and to the two together.

**WHEREFORE**, plaintiffs demand judgment against Sudan as follows:

a.  Judgment against defendant Sudan for compensatory damages in an amount to be determined by the Court which is not less than $200,000,000 (two hundred million dollars);

b.  Judgment against defendant Sudan for punitive damages in an amount to be determined by the Court;

c.  Plaintiffs' costs and expenses;

d.  Plaintiffs' attorneys' fees;

e.  Such further relief as the Court finds just and equitable.

**WHEREFORE**, plaintiffs demand judgment against Defendants United States, Garland, and Blinken as follows:

a. Declaratory judgment finding the CSA, the Act, and/or the two together are unconstitutional and void as written or as applied;

b. Judgment enjoining Defendants United States. Garland, and Blinken from giving effect to the CSA and the Act as written or as applied;

c. Alternatively, if the Court determines that injunctive relief is an insufficient remedy, Plaintiffs asks for a writ of mandamus to compel Defendants United States, Garland, and Blinken to treat the CSA and the Act as null and void as they carry out their duties;

d. Declaratory judgment finding the Act's jurisdiction-stripping provision to be unconstitutional and unenforceable as it deprives federal courts of jurisdiction to consider the Hirshfelds' constitutional claims;

e. Declaratory judgment construing the Act's jurisdiction-stripping provisions narrowly to allow the consideration of Plaintiffs' constitutional claims (a construction that implicitly conflicts with the D.C. Circuit's ruling in *Mark*), or, in the alternative deeming such a construction to be precluded by the D.C. Circuit's ruling in *Mark*;

f. Plaintiffs' costs and expenses;

g. Plaintiffs' attorneys' fees;

h. Such further relief as the Court finds just and equitable;

i.  Plaintiffs further request that this Court retain jurisdiction of this action until Defendants United States, Garland, and Blinken have complied with any and all orders issued by the Court.

October 18, 2023                                    Plaintiffs, by their attorney,

By:  /s/ Asher Perlin_____
Asher Perlin
LAW OFFICE OF ASHER PERLIN
Bar I.D. FL0006
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
786-687-0404
asher@asherpelin.com